RECEIVED AUG 1 6 2004

## Grand Jury Testimony of Sammy Franklin
### July 28, 2004

I have always been a little nervous testifying in front of the Grand Jury, but I [especially am now]. I'm here to [preserve] my dignity.

On July 8, I was asked by Detective Webber if I would be busy that afternoon that he needed me to assist him [in the Siler matter]. I said I would go if I was not too busy. We left after 1:30. We had a plan to take unmarked vehicles so that we would be able to get him [Siler] before he ran. I was with Webber, and in my vehicle were [Josh Monday, Will Carroll, and Shane Green]. My portable was dead. Josh was supposed to go in one way, but instead went another. [Franklin explains confusion about entry to Siler's property.] Webber and I were supposed to be the front door guys, and the others were to go to the backdoor. I knocked on the door twice. David Webber was standing [some distance] away. There was no answer, so we loaded back up and went to the gates of the school. The others couldn't go in the one way.

[They go back to Siler residence.] Shane says, "I think the Son of a Bitch has run." I went to the front door and announced, "Campbell County Sheriff's Department." Mrs. Siler answered the door, and I talked to her. I saw the back door was wide open. I and Will Carroll went in and looked out the back door where we saw the other officers struggling with Mr. Siler. He was not cuffed yet.

A few minutes later officers brought him into the house and set him in a chair. We told Mrs. Siler to leave with her son. I looked in Ms. Siler's purse for weapons or drugs and found sandwich bags of jewelry inside. I thought I had saw her put something in her purse. I called dispatch to log the time that the warrant was being served. Officers Webber and Monday were shouting at Mr. Siler. The cuffs on Mr. Siler were hinged in a strain on his back. I took them off, placed his hands in front of his body, and placed the cuffs back on. Officer Monday slapped him [Siler]. I have been with officers seventeen years, and I have never seen something get out of hand so quickly. I wiped his [Siler's] nose. I had the consent form. I admit I told Siler to sign the damn consent form. I guess you've heard the tape. Josh is the only one I saw slap him [Siler]. He [Monday] slapped him [Siler] on the shoulder and twice on the face. I did threaten to break his [Siler's] fingers -- he snotted on me. I picked the thorns from his [Siler's] shoulder. He [Siler] took the pen ... [Franklin states this is not something he has told before that he just remembered it.] Shane grabs him by the nape of the neck and by the arm [and tries to put his [Siler's] head in the aquarium.] I told Shane to stop.

There was no stopping the officers then. Yes, I was a veteran officer, but I could not stop them. Then the battery charger comes on the table. David says we'll hook one to his nuts and one [somewhere else]. One officer shot a bottle rocket off. After that, I and Will Carroll went outside. Ms. Siler and her son were at the end of the driveway. I talked to Mrs. Siler about giving consent. She said she needed to talk to Eugene. I read the consent form to her and told her we were looking for drugs, money or firearms. She read it twice. She interfered with us coming in. The boy said, "Mommy just sign the

paper." I took her in. When she came out, she said, "They're beating the hell out of him and electrocuting him." I told her they're not electrocuting him. The boy had a handful of wildflowers and wanted to take them into his dad. I told Will Carroll to let the boy see his dad. The boy came back out with a soda pop. The boy tells his momma, "They've not hurt him. He's okay." The boy said he was okay with what he saw. I told David Webber that if he was going to search the residence, get a search warrant. I told him we'd secure the house. David Webber said okay. Some of the officers then found three bottles of pills. They then decided to quit and take him [Siler] to jail. David Webber told the boy that Mr. Siler had been selling drugs to people.

I never laid a harmful hand on Mr. Siler. I did threaten him. They were slapping him during that time. I cannot explain why I did not do something to stop them. Ms. Siler asked if I would secure her house. I did. When we got down on Duff Road, Will said, "I can't believe Shane stuck a battery clip to his nose." We stopped the vehicle. When we got to jail, Will Carroll went to the Sheriff's office, where Josh, Shane, the Sheriff, and Charlie Scott were. Jailer told me that Siler said we beat him with a baseball bat and hooked him to an electrical something, so I took some pictures of Mr. Siler at that time. [Agent] Morrell has the pictures.

When I left, the charger was not plugged up but was on the table. There was an aquarium on the table with water and fish inside. Shane was going to stick Mr. Siler's head in the aquarium, and I stopped him. He [Mr. Siler] had snot. I don't know if he intentionally snotted me, but that's probably when I threatened him. Will Carroll picked him up to carry him to the trailer. I never saw Webber hit him, but he was doing most of the talking. I never saw Will Carroll harm him. I don't know why the bottle rocket was shot. It was one of the officers who did it--probably to intimidate. I was unaware of Mr. Siler being outside working on a hot water heater. The first time I saw him, officers were with him in the backyard. I didn't notice the monitor. There was a little camera hid at the front door. The camera was facing where the cars were. There were dogs running loose; a cat, too. I petted all of them. They could tell who was coming in and out of the driveway.

I can't say whether we should or shouldn't have been fired. I've got feelings. I've cried. I'm angered. I've never been involved in that. I had a week of vacation after this happened, and I felt remorse. In the first statement, I did not say everything about what I saw at the house. It's hard to tell on fellow officers—they're like family members. I have always told the truth previously. I am not innocent—I was there. I wish I hadn't been there. I can't take things back. I was out working a burglary when I found out [the TBI wanted to interview me again]. The other officers knew about the recording beforehand, but I did not.

I charged Ms. Siler with interfering—keeping us at bay until Mr. Siler could exit the trailer. When they found the pills, they charged them both. After the pills were found, Webber decided he wasn't going back. David being the narcotics officer decided he wasn't going to get a search warrant. I don't work drugs. I expressed my opinions with

2

the narcotics officer—it was his case. I didn't intervene. We just went up there to serve a warrant not to get drugs.

Mr. Siler wanted to talk to David Webber about how his probation officer had done him. Mr. Siler said, "I've tried to call you [David Webber], and you've not helped me." His [Siler's] eyes were dark. I don't know if he was under the influence or stress. He had a thick tongue. His eyes were not normal.

[Mr. Franklin was asked why it took five officers to serve a warrant.] Each one is different. If a defendant has been a runner—and Mr. Siler was—then, it may take five.

Josh is my height and stocky-built. David Webber is slender but [muscular]. Shane is real skinny. Will is bigger than me. Before we left, we went to where the officers had struggled with Mr. Siler. There was a burnt sofa/love seat and broken cinder blocks— three to four in square pieces under thorny stuff—thorny bushes.

I didn't see anybody put a gun in Mr. Siler's mouth. I am not aware of any officer having a gun out. Josh picked up a pellet gun beside the door. I am not aware of any shots. I didn't know any bottle rockets were there until I saw them near the sink. There was no gun fire. I jumped when I heard the noise. I wasn't expecting it.

3

IN THE CRIMINAL COURT FOR CAMPBELL COUNTY, TENNESSEE

STATE OF TENNESSEE

VS.                                                    CASE # 12237

DAVID WEBBER,
SAMMY FRANKLIN, et al.

## ORDER

The State of Tennessee by the District Attorney General moved this Honorable Court to authorize the release of certain materials to the U.S. Attorney's Office for the Eastern District of Tennessee in the interest of justice and for good cause. The State showed the Court that the Campbell County Grand Jury requested the assistance of the District Attorney General's Office in the hearing of this cause; that Sammy Franklin and Will Carroll both waived immunity and testified before the Grand Jury; that Assistant District Attorney General Sarah Davis, who was assisting the Grand Jury, made notes during the testimony and preserved the same; and that the U.S. Attorney's Office has requested the notes of General Davis of that testimony for purposes of the sentencing hearing in U.S. District Court of Will Carroll and Sammy Franklin, and

IT IS THEREFORE ORDERED that the Office of the District Attorney General may provide the notes of Asst. District Attorney General Sarah Davis concerning the testimony of Will Carroll and Sammy Franklin before the Campbell County Grand Jury for good cause shown and in the interest of justice.

Enter this the ____29____ day of _____, 2005.

JUDGE OF THE CRIMINAL COURT

APPROVED:

_____
DISTRICT ATTORNEY GENERAL

CRIMINAL COURT — CAMPBELL COUNTY, TN
DATE June 29, 2005  TIME 2:45 p.m.
____BOBBY W. VANN____ CLERK
_____
DEPUTY CLERK